1  **UNITED STATES DISTRICT COURT**
2  **SOUTHERN DISTRICT OF NEW YORK**
3  ============================== :
4  **UNITED STATES OF AMERICA,**                :
5                                               :
6                                               :
7                                               :
8                 — *versus* —                  :      **98-cr-1023 (LAK)**
9                                               :
10                                              :      **Notice of Motion**
11                                              :
12 **ANAS AL LIBY,**                            :
13                 **Defendant.**               :
14 ============================== :
15
16
17      PLEASE TAKE NOTICE that the above named defendant, ANAS AL-LIBY, by and

18  through his attorney of record, Bernard V. Kleinman, Esq., will move this Court before

19  the Hon. Lewis Kaplan, United States District Judge, Southern District of New York, in

20  the United States Courthouse at 500 Pearl Street, New York, NY, at a time that is

21  convenient to the Court for an order, pursuant to Federal Rule of Criminal Procedure R.

22  12(b)(3)(C), suppressing the statement made by the Defendant to the FBI on or about

23  October 12, 2013, and for such further and additional relief as the Court deems just and

24  proper.

25  Dated:  White Plains, NY
26          Sept. 16, 2014
27                                      Yours, *etc.,*
28
29
30
31                                      BERNARD V. KLEINMAN, ESQ.
32                                      Attorney for Defendant al Liby

---

*Law Office of Bernard V. Kleinman, PLLC*                                      Page 1
*2 Westchester Park Drive, Suite 418*
*White Plains, NY 10604*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Law Office of Bernard V. Kleinman, PLLC
2 Westchester Park Drive
Suite 418
White Plains, NY 10604
Tel.: (914) 644-6660
Fax: (914) 694-1647
Email: attrnylwyr@yahoo.com


To:     Hon. Lewis Kaplan
        United States District Judge
        Southern District of New York

        All Counsel of Record via ECF

        Nazih al Raghie, Reg. No. 69539-054

1  **UNITED STATES DISTRICT COURT**
2  **SOUTHERN DISTRICT OF NEW YORK**
3  ═══════════════════════════════ :
4  **UNITED STATES OF AMERICA,**      :
5                                     :
6                                     :   S10 98-cr-1023 (LAK)
7                                     :
8         — *versus* —                :   **Declaration & Memorandum**
9                                     :   **of Law in Support of Motion**
10                                    :   **to Suppress**
11                                    :
12  **ANAS AL LIBY,**                  :   **F.R.Crim.P. Rule 12(b)(3)(C)**
13              **Defendant.**         :
14  ═══════════════════════════════ :

15
16  STATE OF NEW YORK}
17  COUNTY OF WESTCHESTER}          *s.s.:*
18

19      I am Bernard V. Kleinman, attorney of record for the above-named Defendant, Nazih al

20  Raghie, aka, Anas al Liby.

21      I make the annexed motion based upon the records in my office, notes and conversations

22  with my client, the Exhibits and Declaration[s] attached hereto, and upon the records and

23  pleadings previously filed in this matter.

24      In addition, thereto, is the annexed Declaration of Defendant al Liby detailing his abduction,

25  interrogation, subsequent removal to the custody of the FBI, and transportation to the United

26  States for prosecution in this matter. See Exhibit A.[1]

27      All statements herein are made based such review of the record, upon detailed discussions

28  with the Defendant, the annexed Declaration of the Defendant,[2] detailing his kidnapping and

---

[1] This Declaration was previously submitted as an Exhibit to the Defendant's Motion for Rule 16 Discovery. See Docket Entry No. 1634.

[2] As was set forth in Counsel's Motions under Rules 15 and 16, additional evidence was sought as being material to this motion. As the Court has just ruled on these motions, Counsel is now setting forth his grounds for relief at the point in time.

*Law Office of Bernard V. Kleinman, PLLC*                                    **Page 1**
*2 Westchester Park Dr., Ste. 418*
*White Plains, NY 10604*

1  confinement, and meetings with the U.S. Attorney, or upon information and belief, based upon

2  such record.  In addition thereto, this motion is based upon a review of Classified documents and

3  records received by the Defense on or about May 5th, 2014, and disclosure received under

4  Section 6 of the Classified Information Procedures Act, on or about July 21, 2014.

5  <u>Introduction</u>

6    This Motion seeks an Order from the Court suppressing the statement made by the Defendant

7  to the FBI at the time of his formal arrest on October 12, 2013.[3]

8    It is averred herein that the FBI, in conjunction with CIA interrogators, coerced the

9  inculpatory statements from Defendant Al Liby by making improper threats and promises and

10  through the use of excessive force to improperly induce him to make the subject statements.

11    Furthermore, the conditions of his confinement after his abduction by the Delta Force, and

12  his confinement on board the U.S.S. San Antonio, had the effect of eliminating any voluntariness

13  on his subsequent waiver.   It is further averred, herein, that this statement was secured through

14  the use of torture and is, thereby, *per se* inadmissible.  As such, the statements of the defendant

15  to the FBI must be suppressed.

16  <u>Fundamental Legal Principles</u>

17    It is axiomatic that an accused's confession is admissible only if that confession is made

18  voluntarily.  *Green v. Scully*, 850 F.2d 894, 900 (2d Cir.), *cert. denied* 488 U.S. 945 (1988).

19  When a confession is secured as a result of government coercion (see *United States v. Solomon*,

20  509 F.2d 863, 871-72 (2d Cir. 1975) (confession only excludable if improper inducement is

21  made by a person in authority)) it is inadmissible as violative of the defendant's Fifth Amend-

---

[3] A copy of the subject statement is annexed hereto as Exhibit C.

1   ment right against self-incrimination. *Colorado v. Connelly*, 479 U.S. 157 (1986) (confession by

2   schizophrenic who heard voices telling him to confess admissible as there was no evidence of

3   police coercion; *id.* at 165.).

4       In determining the admissibility of a confession, admission or other inculpatory statement the

5   question in each and every case is whether the accused's will was over-borne by the actions of

6   the police (or other law enforcement) at the time the statement was made. *Watts v. Indiana*, 338

7   U.S. 49, 52-53 (1969); *Leyra v. Denno*, 347 U.S. 556, 558 (1954); *Chambers v. Florida*, 309

8   U.S. 227 (1940). Under such circumstances, the inculpatory statement cannot be deemed to be

9   "the product of a rational intellect and a free will." *Blackburn v. Alabama*, 361 U.S. 199, 208

10   (1959). See also *Spano v. New York*, 360 U.S. 315, 322-23 (1959); *Harris v. South Carolina*,

11   338 U.S. 68, 70 (1949); *Ashcraft v. Tennessee*, 322 U.S. 143 (1944). As this Circuit has put it:

12         The purpose of the *Miranda* warning is to ensure that the person in custody has
13         sufficient knowledge of his or her constitutional rights relating to the interrogation
14         and that any waiver of such rights is knowing, intelligent, and voluntary.

15   *United States v. Banner*, 356 F.3d 478, 480 (2d Cir. 2004).

16       Statements given by a defendant to the police must be rendered inadmissible where they were

17   the product of coercion, no matter whether it be physical or psychological. *Miller v. Fenton*, 796

18   F.2d 598, 602-03 (3d Cir. 1986). As the Second Circuit put it,

19         [O]nly those statements a suspect makes "<u>in the unfettered exercise of his own</u>
20         <u>will</u>" may be used against him, *Malloy v. Hogan*, 378 U.S. 1, 8 (1964), and a
21         confession is voluntary only when it is "truly . . . the product of his free choice."
22         *Miranda*, 384 U.S. at 458.

23   *Green v. Scully*, *supra*, 850 F.2d at 900. Emphasis added.

24       In making this determination, the reviewing court is duty-bound to inquire: "Is the confession

25   the product of an essentially free and un-constrained choice by its maker?" *Schneckloth v.*

1   *Bustamonte,* 412 U.S. 218, 225 (1973); *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961). This

2   inquiry is achieved by an examination of the totality of the circumstances under which it was

3   made, surrounding the challenged statement. *Fare v. Michael C.,* 442 U.S. 707, 726 (1979);

4   *Mincey v. Arizona,* 437 U.S. 385, 401 (1978); *United States v. Anderson,* 929 F.2d 96, 99 (2d

5   Cir. 1991); *Green v. Scully, supra,* 850 F.2d at 901. *Compare United States v. Bye,* 919 F.2d 6, 9

6   (2d Cir. 1990) (failure of district court to "engag[e] in the required comprehensive inquiry"

7   mandates remand to district court for further proceedings). Relevant circumstances include, but

8   are not limited to, the conduct of the law enforcement officers, the conditions under which the

9   interrogation took place, and the background of the accused. *United States v. Valdez,* 16 F.3d

10   1324, 1329 (2d Cir.), *cert. denied* 513 U.S. 810 (1994); *United States v. Mast,* 735 F.2d 745, 749

11   (2d Cir. 1984); *United States v. Major,* 912 F. Supp. 90, 95 (S.D.N.Y. 1996).

12       Instructive is the High Court's decision in *Lynumn v. Illinois,* 372 U.S. 528 (1963). In that

13   case the defendant was arrested, in her home, on charges of selling marijuana to a police

14   informant. Confronting her in her home with their accusations, the defendant was told by the

15   police that unless she admitted to the sale and revealed her narcotics supplier she "could get 10

16   years and [her] children could be taken away [from her] . . . and strangers would have them. . ."

17   372 U.S. at 531. Furthermore, she was told that her welfare payments would be terminated.

18   *Ibid.* Being unfamiliar with the law, and having no idea as to whether the threats of the police

19   would turn out so, the defendant made certain admissions.

20       In reversing the conviction, the High Court, in an opinion by Mr. Justice Stewart, held that

21   the proffered statement must be suppressed. The totality of the circumstances, as a standard to

22   be applied herein — the defendant's unfamiliarity with the judicial system, the presence of

23   several police officers, the fear she had of losing her children, her freedom, and her financial

1  support[4] — all worked to render the statement the product of an impermissibly "impellingly

2  coercive" situation. *Id.* at 534-35.

3      As *Lynumn* has been applied (especially in light of the Supreme Court's subsequent holding

4  in *Miranda*), the use of deceit or misrepresentation of the law and facts, and use of threats, to

5  elicit an inculpatory statement will render it in-admissible, provided the impact was to

6  figuratively "browbeat [the] defendant into making a statement." *Anderson, supra,* 929 F.2d at

7  97. For example, in *Anderson, supra,* the Second Circuit upheld the suppression of a post-

8  *Miranda* statement elicited as a result of the DEA agent's telling the accused that if he asserted

9  his right to counsel "it would permanently preclude him from cooperating with the police." *Id.* at

10  98. Similarly, in *United States v. Ruggles,* 70 F.3d 262 (2d Cir. 1995), *cert. denied* 516 U.S.

11  1182 (1996), the Second Circuit upheld the admissibility of statements made to ATF agents in

12  part based upon the fact that the defendant had an extensive background of exposure to the

13  criminal justice system and was "familiar with police questioning." *Id.* at 265. See also *United*

14  *States v. Berkovich,* 932 F. Supp. 582 (S.D.N.Y. 1996), where the district court upheld the

15  admissibility of a statement preceded by a representation by the FBI that cooperation could lead

16  to leniency in sentencing. The District Court (Koeltl, USDJ) ruled that absent evidence

17  indicating that the FBI agents made mis-statements to the defendant "based on unfillable or other

18  promises [that] might perhaps overbear a defendant's will," the confession would be deemed

19  voluntary. *Id.* at 587. In accord see *United States v. R.W. Prof'l Leasing Svces. Corp.,* 317 F.

20  Supp.2d 167 (E.D.N.Y. 2004) ("Promises of leniency, without more, do not invalidate a *Miranda*

21  waiver. [Citation omitted.] Although material misrepresentations based on unfulfillable or other

---

[4] See *Arizona v. Fulminante,* 499 U.S. 279, 186 (1991); *Zappulla v. New York,* 391 F.3d 462, 474-75 (2d Cir. 2004).

1    improper promises might overbear a defendant's will." *Id.* at 174.)  However, any such

2    inducement, innocent or otherwise will be vitiated if made <u>after</u> the accused has received his

3    *Miranda* warnings. See *United States v. Morrill*, 1998 WL 135819 at *2 (W.D.N.Y. 1998).

4    <u>The Defendant's Abduction, Detention & Interrogation</u>

5         Annexed hereto is the Declaration of the Defendant, Nazih abdul al Raghie, aka, Anas al

6    Liby, setting forth the details of his abduction, detention, interrogation, and subsequent delivery

7    to the jurisdiction of this Court.[5]  See Exhibit A.  This declaration sets forth, in minute detail, the

8    events that occurred on October 5th, 2013 when the accused was kidnapped outside of his home

9    in Tripoli, Libya, by forces of the U.S. Army's Delta Force, held for approximately eighteen

10   hours at an undisclosed site in Libya, transported by a Zodiac-type vessel to the a U.S.S. San

11   Antonio, operating in international waters off the coast of Libya, held in inhumane conditions for

12   more than a week while undergoing unlawful, threatening, and abusive interrogation techniques

13   by professional interrogator(s) of the Central Intelligence Agency, and then turned over to the

14   FBI where he was compelled, both directly and indirectly, to execute a waiver of rights, and then

15   had a detailed statement extracted from him.  The Declaration, and additional evidence discussed

16   herein, along with documentary records annexed hereto, make it plain that any free will and

---

[5] Defendant has previously moved before this Court for dismissal of the charges against him on
the basis that the Court lacks *in personam* jurisdiction over him on various grounds.  See Docket
Entry Nos. 1484 thru 1486.  On May 22, 2014 this Court denied the motion for dismissal.  See
*United States v. Anas al Liby*, 2014 WL 2135939 (S.D.N.Y. 2014).  Needless to say, the
Defendant still maintains this position, and holds that the actions of the United States were in
violation of both United States and international law.

1    knowing voluntariness of the accused was clearly overborne by the actions of both the CIA and

2    FBI, thus rendering the statement he made inadmissible.[6]

3        According to the Defendant he had been living in Libya since the overthrow of Col. Qaddafi

4    in 2010.  Al Raghie Declaration at ¶ 6.  He had participated in the revolution as a long-time

---

[6] Of course a key determinant is the actual manner in which the accused was interrogated, and how it impacted any "voluntary waiver" of rights, would be the conditions under which he was held on the San Antonio, and the manner of extraordinary interrogation techniques utilized by the CIA.  The Defendant has made clear that, upon his observation, all of the proceedings, including his sleep area, were under constant video surveillance.  See Al Raghie Declaration at ¶ 19.  While Defendant has made a Rule 16 request for the videotapes on the interrogation, *etc.*, the Government has responded that it is "unaware of any video or audio recordings."  See Gov't Response to Rule 16 Motion at n. 2.

On July 25, 2014, the Court, disappointingly, accepted this Response as adequate and that no further inquiry of the CIA would be necessary.  See *id.* at ¶ 2.

It is the Defendant's position that this Response to the Government is wholly inadeqate, entire-ly meaningless, and provides no real direction to the Court or any other factfinder.  To be "unaware" of something means that one has no knowledge of its existence.  It is to have "voluntary ignorance" or "willful obliviousness" of a fact, defined as "an unknowing or unaware state resulting from the neglect to take reasonable steps to acquire important knowledge".  BLACK'S LAW DICTIONARY (9th ed. 2009) (Emphasis added).  See generally *Lane Constr. Corp. v. State*, 128 Vt. 421, 428, 265 A.2d 441, 445 (S. Ct. Vt. 1970) ("Knowledge of true facts [*sic*] may be essential to careful conduct, and where knowledge is required, voluntary ignorance is culpable and affords no protection from legal liability."  Emphasis added.).  See also *Hardy v. Harbin*, 1 Sawy. 194, 11 Fed. Cas. 504 (Cir. Ct. Calif. 1870), *aff'd* 154 U.S. 598 (1872) (analogizing "voluntary ignorance" to "willful blindness", *id.* at 510).

This lack of knowledge would be easily remedied by the prosecution making inquiry of the agency as to whether any videos exist, and then providing that response in a Declaration or an Affidavit from the appropriate party.  That has not been done here.  Hence, the Defendant takes the continued position (and exception to the Court's ruling) that this answer of the Government is, in fact, no answer at all.  See Reply of Defendant Al Liby to Gov't Response at pp. 8-10.  District Court Docket Entry No. 1648.

Furthermore, due to the failure to provide these videos, it is not unreasonable to infer that extraordinary interrogation techniques were, in fact, utilized by the interrogators.  As U.S. Attorney Preet Bharara stated, in another context,

> The most egregious inmate beatings frequently occur in locations without video surveillance.

See *CRIPA Investigation of the N.Y.C. Dep't of Correction Jails on Rikers Island* (Aug. 4, 2014), at p. 20, reprinted at http://www.justice.gov/usao/nys/pressreleases/August14/RikersReportPR/SDNY%20Rikers%20Report.pdf.

---

1   member of the Libyan Islamic Fighting Group ("LIFG").  Al Raghie Declaration at ¶ 7.  The

2   LIFG had been formed in the 1990s as a group dedicated to the overthrow of the Qaddafi regime.

3   And, notwithstanding the unfortunately incestuous relationship between the CIA and Qaddafi's

4   own intelligence agencies (see Exhibits attached to Defendant al Liby's Rule Motion 15 to

5   Depose [REDACTED], Docket Entry No. 1711), the Defendant worked alongside the United

6   States and its NATO allies in seeking to actively remove Col. Qaddafi from power in 2010.  Al

7   Raghie Declaration at ¶ 8.

8        As the Defendant was returning from his normal routine of morning prayers, in the pre-dawn

9   hours of October 5th, he was seized by an unknown number of members of the U.S. Army's

10  Delta Force.  Using tazers, he was subdued, hustled into a van, handcuffed, blindfolded, and had

11  sound canceling earmuffs placed over his ears.  Al Raghie Declaration at ¶ 9.  ████████

12  ███████████████████████████████████  He was then taken for a brief ride and

13  deposited in a building, still in the same restraints, except now he was also placed in leg irons,

14  too.  Al Raghie Declaration at ¶ 11.  For the entire time he was there (of approximately 18 hours)

15  he was not offered any food; only water to drink.  Al Raghie Declaration at ¶ 11.  Never having

16  identified themselves, though knowing that these were Americans, he anticipated, with a more

17  than reasonable basis for so thinking, that he was likely to end up in one of the infamous CIA

18  black sites, and face both physical and psychological torture.  Al Raghie Declaration at ¶ 13.[7]

---

[7] Or, as an equally fearful alternative, that he would be turned over to one of the U.S.'s allies for disposition as happened to Abdul Hakim Belhaj, who was first kidnapped by the CIA, held in a CIA prison in Thailand and tortured (along with his pregnant wife), and then turned over to Qaddafi's own intelligence services for final disposition.  See Report of the Constitution Project's Task Force on Detainee Treatment (2013) at pp. 270-72, reproduced at *http://detaineetaskforce.org/pdf/Full-Report.pdf*.  This series of events was well-known to the Defendant based upon his personal relationship with Mr. Belhaj, and that this set of facts is well documented.  See Al Raghie Decl. at ¶ 17.

1    At some time that evening he was brought to a small Zodiac-type vessel at the shore,

2    trundled aboard (while still in full restraints) and taken for a teeth rattling ride to another vessel.

3    During this ride he suffered from nausea and sea sickness due to the roughness of the ride. Al

4    Raghie Declaration at ¶ 14. It is now known that this ride culminated on him being placed on

5    board on the U.S.S. San Antonio. *See, e.g., U.S. Said to Hold Qaeda Suspect on Navy Ship*, N.Y.

6    Times, Oct. 6, 2013.[8]

7    During his interrogation, on board the San Antonio,[9] the Defendant believes that among the

8    interrogators was a member of the FBI. See Al Raghie Declaration at ¶ 15. Indeed, the FBI

9    Report on the abduction clearly states that, minimally present at the time of abduction, was "SA

10    ████". See FBI Report ID: AAL-C-000012. Exhibit D. The Report goes on to detail the

11    numerous activities of "SA [REDACTED]" participating in the process. *Ibid.*

---

[8] The U.S.S. San Antonio is an amphibious transport dock ship designed to deliver both troops and helicopters to a combat zone. See http://www.san-antonio.navy.mil/. Significantly, the ship has a large open deck in the stern, capable of holding multiple aircraft, on which, upon information and belief, it is believed the Defendant was held in some sort of interrogation and living quarters pods.

Defendant has previously moved for the opportunity to view the San Antonio and the specific places where the accused was interrogated by the CIA and the FBI. See Defendant's Rule 16 Motion. Docket Entry No. 1634, at ¶ 5. On July 25, 2014, this Court denied that request. *Id.* at ¶ 5.

Nevertheless, the Defendant takes the position that this examination ought to have been permitted under Rule 16(a)(1)(E), is material and relevant to a an informed decision on this motion, and takes exception to the Court's ruling.

[9] This fact, not disputed by the Government in its Rule 16 pleadings, poses certain difficulties. First of all, notwithstanding the position of the Government that the actions on board the San Antonio were not "Government actions", under Rule 16 (see Gov't Response at pp. 11-12), the presence of a federal law enforcement agent seriously and materially belies this argument. Secondly, the presence of the FBI agent and either his direct or indirect interrogation of the accused, in the absence of any *Miranda* warnings (see Al Raghie Declaration at ¶ 23; see also Exhibit C) seriously, materially, and fatally taints any subsequent inculpatory statements made by the Defendant.

---

1    The document that is the subject of this suppression motion does not identify any of the FBI

2    Agents who either conducted the subject interviews post-CIA, or who drafted and prepared the

3    FBI interview notes.[10]

4    The Defendant makes clear that his interrogators made both explicit and implicit statements

5    that physical torture, or transfer to one of the infamous CIA prison sites, would surely follow the

6    San Antonio interrogation.  This was based not only upon statements made by the interrogators,

7    but also based upon the Defendant's own personal knowledge of the heinous and shameful

8    behavior in which the CIA had engaged in in the past.  See Al Raghie Declaration at ¶¶ 16, 17.

---

[10] While the issue of FBI participation in the on board interrogation of Mr. al Liby clearly raises certain legal issues, it should be noted that it also would appear to violate FBI procedure and protocol.  First of all, while the interrogators were directed to utilize procedures as set forth in Army Field Manual 2-22.3 (see Exhibit E), the use of such techniques "permit[] DOD interrogators to use some techniques that FBI agents cannot employ, such as methods known as 'fear up' or 'pride and ego down.'"  *A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanoamo Bay, Afghanistan, and Iraq* (U.S. Dep't of Justice, Office of the Inspector General May 2008) at p. 365.  Furthermore, the May 2004 FBI Detainee Policy makes it clear that FBI joint interrogation with non-FBI personnel is limited solely to the use of interrogation techniques as approved by the FBI itself, and that if non-FBI approved techniques are utilized, FBI participation is forbidden, *viz.*,

> FBI personnel who participate in interrogation with non-FBI personnel or who participate in interrogations of persons detained jointly by FBI and non-FBI agencies or entities shall at all times comply with FBI policy for the treatment of persons detained.  <u>FBI personnel shall not participate in any treatment or use any interrogation technique that is in violation of these guidelines regardless of whether the co-interrogator is in compliance with his or her own guidelines.</u>  If a co-interrogator is complying with the rules of his or her agency, but is not in compliance with FBI rules, FBI personnel may not participate in the interrogation and must remove themselves from the situation.

Memorandum: *Treatment of Prisoners and Detainees*, as approved by Valerie Caproni [then FBI Gen'l Counsel], and John Pistole [then Acting Deputy Director of the FBI], May 19, 2004, Case ID # ▓▓▓▓▓▓▓▓▓▓  Emphasis in original.

This Memorandum was furthermore marked for dissemination as follows: "To be distributed to all FBI personnel who are now, or in the future are, detailed to Iraq, Guantanamo Bay, Cuba, or Afghanistan <u>or other foreign locations in which similar detention and interrogation issues may arise.</u>"  Emphasis added.  Clearly, the interrogation by the CIA, on board the San Antonio, comes within this definition.

---

Whenever he was moved he was handcuffed, had ear muffs placed on him, and was blind-folded.  See Al Raghie Declaration at ¶ 22.  As he describes his conditions,

> The room where I was kept, while not being interrogated, also had no furniture whatsoever.  There was no bed, no chair, no sink, no toilet, no window — nothing at all to alleviate the pain and confusion I had.  There was a solid door so I could not see or hear any other people.  The light was kept on all of the time, every day, for 24 hours with no let up.  This made it all but impossible to sleep and rest.  Whenever I had to use the toilet I had to knock on the door and ask permission.  They gave me a blanket to sleep on, and a blanket as a pillow, and a blanket to cover me.  That was all.  I was cold all of the time.  I was forced to take my meals in this room.  What the room did have was a camera so I was under video surveillance the entire time.  I was convinced that I was going to end up in a CIA Torture Prison in Pakistan or Jordan.

Al Raghie Declaration at ¶ 20.

Upon his formal transfer to the custody of the FBI, for final transport to the United States, he informed the FBI that he had been on a hunger strike for three days.  He was handed a waiver form (see Exhibit F), and "[a]fter repeated verbal pressure to sign it, I did so."  Al Raghie Declaration at ¶ 23.

Indeed, according to the notes of the interrogating FBI agent, the waiver form was handed to the Defendant on October 12, 2014, at 09:21 a.m. N.Y. time. See Exhibit G.  Not until thirty minutes later did he sign it.  *Ibid.*  Considering the relative brevity of the form, the fact it was in Arabic, and the simple language contained therein, clearly it should not have taken such a length of time to read it and execute it if his waiver was voluntary.

As Mr. al Raghie summarizes his treatment with this regard,

> After having been subject to the treatment above, and being confused and disoriented, with no understanding of where I was, or what would happen to me, I gave the statement FBI has.  I felt the only way to be treated fairly and humanely was if I did what I was told — after all, I had been subject to interrogation for more than a week and I felt there was little, if any, difference between the actions of the FBI and those of the CIA.  After more than a week of intense interrogation by the CIA any sense of asserting my own rights, or having

1  the ability to independently determine if I wished to voluntarily speak, was long
2  since gone.

3  Al Raghie Declaration at ¶ 25.

4  The Defendant's Waiver of His *Miranda* Rights was Anything But Voluntary

5  It is the position, first of all, that once the accused was kidnapped by the Delta Force and

6  deposited on board the San Antonio, he was in custody of U.S. law enforcement, and, hence,

7  subject to all the rights granted to him under *Miranda* and its progeny, and that the failure to

8  accord him all the rights attendant thereto, taints any subsequently made statement.

9  *Miranda* only applies if the suspect was (1) interrogated while (2) in custody. *See, e.g.,*

10  *Rhode Island v. Innis,* 446 U.S. 291, 300 (1980) ("It is clear therefore that the special procedural

11  safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but

12  rather where a suspect in custody is subjected to interrogation"). Interrogation under *Miranda* is

13  "express questioning or its functional equivalent" that law enforcement officers "should know

14  [is] reasonably likely to elicit an incriminating response." *Id.* at 301-02.

15  "*Miranda* warnings are required only where there has been such a restriction on a person's

16  freedom as to render him 'in custody.'" *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977) (*per*

17  *curiam*).  In accord see *J.D.B. v. North Carolina,* — U.S. —, 131 S. Ct. 2394, 2402 (2011).

18  "Although the circumstances of each case must certainly influence a determination of whether a

19  suspect is in custody for purposes of receiving of *Miranda* protection, the ultimate inquiry is

20  simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree

21  associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125 (1983) (*quoting*

22  *Mathiason, supra,* 429 U.S. at 495).

23  In *Mathis v. United States,* 391 U.S. 1 (1968), the Supreme Court held that "nothing in the

1   *Miranda* opinion . . . calls for a curtailment of the warnings to be given persons under

2   interrogation by officers <u>based on the reason why the person is in custody.</u>"  Emphasis added.

3   While the petitioner in *Mathis* was serving time in a state prison for an unrelated conviction, an

4   IRS agent questioned him about tax refunds he had claimed on his individual income tax returns.

5   The agent did not read the petitioner his *Miranda* rights prior to obtaining documents and oral

6   statements subsequently used to convict the petitioner of two counts of knowingly filing a false

7   tax refund claim. At trial, the district court denied the petitioner's attempts to suppress the

8   evidence elicited by the revenue agent.  On appeal, the circuit court affirmed the district court.

9       The Supreme Court reversed the lower courts, finding that the petitioner was entitled to

10   receive a *Miranda* warning prior to questioning by the government agent.  Specifically, the

11   Supreme Court rejected the respondent's contentions that *Miranda* did not apply because:

12         (1) the questions asked were part of a routine civil, rather than criminal, tax

13            investigation; and

14         (2) the petitioner was in jail for a separate offense than that for which he was being

15            questioned.

16       The respondent's first contention was rejected because, as occurred with the defendant in

17   *Mathis,* civil tax investigations frequently lead to criminal prosecutions.[11]  In rejecting the

---

[11] Were the Government to argue that the CIA interrogation involved no questions regarding the East Africa Embassy Bombings, and was therefore substantially insulated from the charges here, this argument must fail. First of all, it is clear that an FBI agent was present during the period of interrogation on board the San Antonio.  See al Raghie Decl. at ¶ 17; See also Exhibit C. Furthermore, and dispositive on this issue, is the fact that the CIA interrogation contained numerous questions regarding the Defendant's personal association, familiarity, and/or knowledge of a number of real and suspected al Qaeda operatives.  Since the Defendant is specifically charged solely with the Conspiracy Counts of the indictment (Count 1: Conspiracy to Murder U.S. Nationals, "together with other members and associates of al Qaeda"; Count 2: Conspiracy to Commit Murder, with "others known and unknown"; Count 3: Conspiracy to

1   second distinction, the Supreme Court found that requiring *Miranda* warnings only where

2   questioning occurs in connection with the case for which a suspect is being held in custody "goes

3   against the whole purpose of the *Miranda* decision which was designed to give meaningful

4   protection to Fifth Amendment rights." 391 U.S. at 4.

5       The central holding of *Mathis* is that a *Miranda* warning is required whenever an

6   incarcerated individual is isolated from the general prison population and interrogated, *i.e.*

7   questioned in a manner likely to lead to self-incrimination.

8       Any doubt that al Raghie was in *Miranda* custody is erased by the Supreme Court's opinion

9   in *Maryland v. Shatzer,* 559 U.S. 98 (2010). In *Maryland v. Shatzer,* the Supreme Court found

10  an incarcerated prisoner subjected to questioning on an unrelated crime to be in custody for

11  *Miranda* purposes. The Court's opinion discussed whether incarceration necessarily constitutes

12  custody, which it had "never decided . . . and [had] indeed explicitly declined to address . . ." *Id.*

13  at 112.   Concluding that "all forms of incarceration" satisfy the restraint on freedom of

14  movement analysis of custody, the Court nevertheless held that "lawful imprisonment imposed

15  upon conviction of a crime does not create the coercive pressures identified in *Miranda* " and

16  therefore *Miranda* rights are not triggered simply because an individual is incarcerated. *Ibid.*

17  That is, *Miranda* custody requires both a restraint on movement, which is always satisfied by

18  incarceration, and coercive pressure, precisely what took place with regard to Mr. al Liby.

---

Murder, "together with other members and associates of al Qaeda"; Count 5: Conspiracy to
Destroy U.S. Property, "together with other members and associates of al Qaeda"; and Count 6:
Conspiracy to Attack National Defense Utilities, "together with other members and associates of
al Qaeda") his knowledge or familiarity with the individuals presented to him by the CIA can,
arguably, establish a critical element of the Government's case.

1    In this analysis, what cannot be ignored is the fact that the presence of an FBI agent on board

2    the San Antonio has never been denied by the Government. This very fact, combined with the

3    statement of the Defense Department at the time of the defendant's kidnapping, that the action

4    was done for the purpose of "using all the tools at our [*i.e.*, the Department of Defense's]

5    disposal to bring to justice those who commit terrorist acts against Americans", and to assist in

6    the Defendant's capture for the purposes of the indictment in this case,[12] makes it clear that both

7    the CIA and the military were acting as pro-active arms of the prosecutorial scheme. See

8    generally *United States v. Villa*, 2014 WL 280400 at *3 (D. Conn. 2014); *United States v. Upton*,

9    856 F. Supp. 727, 749, 750 (E.D.N.Y. 1994), where the district court defined "Government" to

10   include any agency in the Government acting jointly or in concert with the subject prosecution

11   and investigation. *Id*. at 749-50.

12    The critical issue in this inquiry becomes whether the prisoner is isolated from the general

13   prison population for questioning. "*Miranda* . . . was designed to guard against . . . the 'danger

14   of coercion [that] results from the *interaction* of custody and official interrogation.'" *Id*. at 112

15   (citing *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)) (emphasis in *Shatzer*, brackets in original).

16   While locking doors or handcuffing the inmate enhances the potential for coercion, isolation is

17   perhaps the most coercive aspect of custodial interrogation. Assuming the inmate – or, as in the

18   case at bar, the Defendant – is indeed undergoing interrogation, being placed in a room, totally

19   segregated from all human contact save his interrogators, this can well be characterized as the

20   most coercive of interrogation techniques (save actual physical torture), and can easily translate

21   into a party's will being overborne.

---

[12] See Department of Defense News Release No. 700-13 (Oct. 6, 2013), annexed hereto as Exhibit B.

1    "When a prisoner is removed from the general prison population and taken to a separate

2    location for questioning, the duration of that separation is assuredly dependent upon his

3    interrogators." *Id.* at 113, n. 8 (emphasis removed from original). The sense of control exercised

4    by interrogators over the prisoner in determining the length of the prisoner's removal from his

5    normal life further reinforces the element of coercion. A prisoner may feel he has no choice but

6    to cooperate and provide the exact answers his interrogators seek to elicit, regardless of the

7    potential for incrimination. We believe a reasonable person in an inmate's position would view

8    such interrogation conducted in isolation as coercive, thus necessitating a *Miranda* warning. See

9    *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984) (in determining custody, the court must assess

10    "how a reasonable man in the suspect's situation would have understood his situation").

11    In *Perez v. Ercole,* 2011 WL 403912 (S.D.N.Y. 2011), Judge Pauley distilled the test down

12    to the following:

13        "the ultimate inquiry is simply whether there is a formal arrest or restraint of
14        freedom of movement of the degree associated with a formal arrest." . . ..
15        Custody "must be determined based on how a reasonable person in the suspect's
16        situation would perceive his circumstances." . . .. Thus, "the initial determination
17        of custody depends on the objective circumstances of the interrogation, not on the
18        subjective views harbored by either the interrogating officers or the person being
19        questioned."

20    *Id.* at *2. Citations omitted.[13]

21    In the context of the CIA interrogations involved here, that preceded the FBI-administered

22    *Miranda* warning, some guidance is provided by the Court's decisions in several "terrorism"

---

[13] See also, e.g., *United States v. Taylor,* 2014 WL 1653194 (E.D.N.Y. 2014),
    To determine whether a person is in custody, courts must 'ascertain whether, in light of
    "the objective circumstances of the interrogation, a reasonable person would have felt he
    or she was not at liberty to terminate the interrogation and leave.'"
    *Id.* at *5.

1  related cases.  In *United States v. Bary*, 978 F. Supp.2d 356 (S.D.N.Y. 2013), the Court discussed

2  the basic parameters of interrogation, the fruits of which were statement[s] sought to be

3  suppressed by defense counel.  There, the Court set forth the fundamental outline as to how such

4  interrogation ought to be analyzed, *viz.*,

5      "[i]n determining whether a defendant's will was overborne in a particular case,
6      the Court has assessed the totality of all the surrounding circumstances—both the
7      characteristics of the accused and the details of the interrogation. Some of the
8      factors taken into account have included the youth of the accused . . .; his lack of
9      education, . . .; or his low intelligence . . .; the lack of any advice to the accused of
10     his constitutional rights . . .; the length of detention, . . .; the repeated and
11     prolonged nature of the questioning; . . . and the use of physical punishment such
12     as the deprivation of food or sleep . . .  In all of these cases, the Court determined
13     the factual circumstances surrounding the confession, assessed the psychological
14     impact on the accused, and evaluated the legal significance of how the accused
15     reacted. . . .  The significant fact about all of these decisions is that none of them
16     turned on the presence or absence of a single controlling criterion; each reflected
17     a careful scrutiny of all the surrounding circumstances."

18  *Id.* at 362, n. 28.  Citations omitted.

19  Of course, the circumstances under which the accused was questioned by British law

20  enforcement[14] were wholly and materially different from those in the case at bar.  As this Court

21  noted, Bary was well educated and intelligent individual, and perhaps most important was a

22  trained lawyer in his native Egypt.  *Id.* at 363.  In addition, Mr. Bary is fluent in English, as

23  opposed to Mr. al Liby who is anything but "fluent" in English, and, as the Court well knows,

24  requires the use of an Arabic interpreter.  In addition, there is nothing in Mr. al Liby's

---

[14] Of course the issue in *Bary* of the application of the "joint venture doctrine", is non-existent here.  See discussion at 978 F. Supp.2d at 366-67.  Unlike *Bary*, the interrogation in the case at bar was conducted on a U.S. naval vessel, in international waters, by agents of the Central Intelligence Agency and the FBI.  Upon information and belief, there was no foreign involvement whatsoever, notwithstanding the unsubstantiated and un-sourced reports of Libyan collusion (rendering them wholly unreliable) in Mr. al Liby's abduction.  This can be compared to the *Bary* situation where "[t]o the extent there was any American involvement at all with respect to Operation Challenge, it was limited to two incidents."  *Id.* at 370.

1    background that indicates a familiarity or level of comfort with the judicial process — be it

2    common law, civil law, or Islamic law (as exists in Libya).  See Vandewalle, D., *A History of*

3    *Modern Libya* at pp. 122-26 (Cambridge Univ. Press 2006).

4        Furthermore, "the conditions of Mr. Abdel Bary's interrogation clearly were acceptable and

5    not coercive."  *Id.* at 363-64.  In the case at bar, the conditons Mr. al Raghie suffered,were

6    anything but acceptable by even the most minimal of law enforcement standards, and were

7    designed to be coercive.

8        Thirdly, Mr. Bary had the benefit of counsel the entire time he was being interogated by the

9    British police.  That was certainly not the case with Mr. al Liby.

10       These are just a minor sampling the the differences between the interrogation of Mr. Bary

11   and that of Mr. al Liby.

12       It is recognized, needless to say, that in *Bary* the issue revolved around the admissibility of

13   the statement made to the British police, and in the case at bar the issue presumably revolves

14   around thr statement made by Mr. al Liby once he was formally handed over to the FBI after a

15   week's interrogation by the CIA.  However, the point here is how the poisonous and fatal taint

16   that this week's long interrogation had on the subsequent FBI interrogation.

17       In other words, this is a"fruit of the poisonous tree" argument.  See *Silverthorne Lumber Co.*

18   *v. United States*, 251 U.S. 385, 391-92 (1920).  This doctrine essentially provides that evidence

19   derived from the unlawful activities of the the police *is* so tainted by those unlawful actions as to

20   be inadmissible in Court.  Only in the event that the subject evidence, if it would have otherwise

21   been discovered by the police, will it be deemed admssible.  See *Wong Sun v. United States*, 371

22   U.S. 471, 484-85 (1963).  And, the principle, although developed in the Fourth Amendment

23   context, is equally applicable in the context of both the Fifth and Sixth Amendment protections

1  afforded the accused.  See *Nix v. Williams*, 467 U.S. 431, 442 (1984); *Murphy v. Waterfront*

2  *Comm'n of N.Y. Harbor*, 378 U.S. 52, 79 (1964).

3      This Court confronted a similar, but not entirely exactly the same, circumstance in *United*

4  *States v. Ghailani*, 743 F. Supp.2d 242 (S.D.N.Y. 2012).  There the Court was confronted by a

5  situation where the defendant was interrogated both by foreign agents, on their soil, at the behest

6  and supervision of the CIA, and separately by the CIA itself.  The Government argued that

> 7   the CIA interrogated Ghailani for the purpose of obtaining intelligence thought
> 8   directly relevant to national security objectives.  Any violation by it of Ghailani's
> 9   Fifth and Sixth Amendment rights therefore occurred in circumstances is which
> 10  the CIA probably did not contemplate, and in any case was not likely motivated
> 11  by, a possible criminal prosecution of Ghailani.

12  *Id.* at 255.

13      In the case at bar, however, the facts belie such an argument.  As was set forth *supra*, there is

14  no question that the accused was seized as part of a plan to bring him to New York for prose-

15  cution in the Embassy Bombings indictment.  This Department of Defense made abundantly

16  clear in its Press Release (see Exhibit B), and this has never been denied by the Justice

17  Department.

18      In *Ghailani*, the issue revolved around the use of evidence obtained as a result of the

19  accused's extraordinary detention and interrogation.  The Court distilled the issue down to

20  whether the challenged testimony was sufficiently attenuated from the unlawful conduct as to

21  render it admissible.  And, relied upon the tests set forth in the Second Circuit decisions of

22  *United States v. Leonardi*, 623 F.2d 746, 752-53 (2d Cir. 1980), and *United States v. Reyes*, 157

23  F.3d 949, 954 (2d Cir. 1998), cited to and quoted from at 743 F. Supp.2d at 258, ns. 92, 93.  As

24  this Court distilled the application of these decisions, specifically in the context of the self-

25  incrimination clause of the Fifth Amendment, it was held that

attenuation analysis addresses two different concerns in determining whether to admit evidence derived from illegal government conduct.  <u>The first three factors look to the closeness of the connection between the testimony of the witness and the coercion applied to the defendant.  This is consistent with self incrimination privilege interests because it seeks to determine whether the derivative testimony truly would be tainted by the coercion or whether, instead, the casual link is so tenuous that the testimony should not be treated as fruit of the defendant's coerced statements.</u>  The fourth factor, the motive of the governmental actors, on the other hand goes to the different question whether exclusion would deter future governmental misconduct of the type at issue, a pertinent consideration, but one that is not the primary focus of the exclusionary rule in the self incrimination context.  Nevertheless, as all four factors are pertinent in varying degrees in coerced confession and statement cases, there is an appropriate role for attenuation analysis in cases such as this.

743 F. Supp.2d at 259.  Emphasis added.[15]

Both *Leonardi* and *Reyes* relied upon the Supreme Court's seminal ruling on attentuation, *United States v. Ceccolini*, 435 U.S. 268 (1978).  In *Ceccolini* the Court, in reaching its decision looked at, as a significant and determinative factor, the amount of time that lapsed between the unlawful police conduct and the interrogation which resulted in the statement sought to be admitted, *viz.*,

Substantial periods of time elapsed between the time of the illegal search and the initial contact with the witness, on the one hand, and between the latter and the testimony at trial on the other.

*Id*. at 279.

---

[15] The Court was unable to come to a conclusion based upon the then evidence before it.  It therefore directed that the Government ought to present testimonial evidence from the FBI, CIA and Tanzanian witnesses to satisfy the degree to which the subject evidence was attenuated from the corrupted interrogation techniques.  *Id*. at 261.  Certainly, in the case at bar, this is the minimum that would be required, and the testimony ought well include that, not only of the CIA interrogators, but those military personnel who participated in the abduction in Tripoli (*i.e.*, members of the Delta Force), and the military authorities who actually ordered the abduction and interrogation, see Defendant al Liby's Rule 15 Motion for Deposition of [REDACTED], Docket Entry No. 1640.

1   It is recognized that in many instances the suppression court must make a ruling based upon

2   the particular facts of the case.  This involves the "dissipation of the taint" concept, where the

3   hearing court "attempts to mark the point at which the detrimental consequences of illegal police

4   action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies

5   its cost."  *Brown v. Illinois*, 422 U.S. 590, 609 (1975) (Powell, J., concurring).  In accord see

6   *United States v. Leon*, 468 U.S. 897, 911 (1984); *United States v. Culligan*, 2007 WL 3232484 at

7   *16 (W.D.N.Y. 2007).

8   Instructive is this Court's subsequent decision in *United States v. Ghailani*, 743 F. Supp.2d

9   261 (S.D.N.Y. 2010).  There the Court was confronted with the question whether evidence

10  derived from the use of extraordinary interrogation techniques as applied to the accused, so

11  tainted derived evidence regarding a co-conspirator of the defendant Ghailani.  As a result of this

12  information the co-conspirator was arrested and made certain statements that the prosecution

13  sought to have admitted at trial as against defendant Ghailani.  See description as set forth in 743

14  F. Supp.2d at 268-72.  As Your Honor summarized the issue:

15  The ultimate question now before this Court therefore is whether the government
16  has established that the connection between [co-conspirator] Abebe's testimony
17  and Ghailani's unlawfully coerced statements is so remote as to permit Abebe to
18  testify.

19  *Id.* at 275.

20  Rejecting the Government's argument that "deterrence" of unlawful government conduct is

21  the determinative factor (*id.* at 275-76), Your Honor, rather focused upon the two *Ceccolini*

22  factors, *viz.*,

23  the willingness of the witness "to freely testify" and the directness of the "link
24  between the illegality and [the witness's] testimony."

25  *Id.* at 277, quoting from *Ceccolini*, *supra*, 435 U.S. at 278.

1    The Court then went through what it termed as "The *Ceccolini-Leonardi* Factors".  *Id.* at

2    278-84.  "The first of the considerations . . . is the closeness and proximity of the challenged

3    testimony to the violation of the defendant's constitutional rights."  *Id.* at 278.  In the case at bar,

4    Mr. al Liby's seven day CIA interrogation lasted from October 6 through October 12, 2013.  See

5    Exhibit H annexed hereto.  According to the CIA log, at 1:03 p.m., on October 12th, the

6    Defendant was turned over to the FBI.  The handwritten notes of the FBI reflect a time of 9:00

7    a.m., N.Y. time as when this occurred, or "1400 [indecipherable] Time".  The Waiver Form he

8    executed was dated October 12, 2013, at 9:50 a.m., N.Y. time.  See Exhibit F.  The FBI

9    interrogation notes are dated October 12, 2013, and state that the defendant was first spoken to

10   by the FBI "[a]t 11.05 a.m. (Eastern Time), . . ."  See Exhibit C at p. 2.  This was all of one hour

11   after he had executed the waiver, and two hours from the time at which his CIA interrogation had

12   ended.

13        The CIA notes show (assuming them to be accurate) that Mr. al Liby was subject to

14   interrogation for a period of more than 30 hours over the course of the week.  While this might

15   be trivialized by the Government as coming to little more than four hours per day, when

16   combined with the fact that Mr. al Liby had no idea what the end result of his interrogation

17   would be — anything from a CIA black site, to being turned over to another hostile Government

18   as occurred with Mr. Belhaj, to permanent resience at Guantanomo Bay, to trial in New York —

19   this must have seemed like a lifetime to him.

20        The second consideration is the individual's "[w]illingness to testify".  *Id.* at 278-79.  While

21   Mr. al Liby did execute a Waiver Form, he has since disavowed that form.  In addition, in

22   *Ghailani* the Court was persuaded by the fact, among others, that the subject witness (Abebe)

23   had been "taken off the street in Arusha, flown to an unknown location in Zanzibar, held

1    *incommunicado* and questioned for a week, . . ." *Id.* at 279; behavior very much as happened to

2    the defendant herein.

3          The third relevant factor is "whether the witness's cooperation was induced 'as a result of'

4    the evidence illegally obtained from the defendant." *Id.* at 282.  In the case at bar it is well nigh

5    impossible to dissociate the seven days of CIA interrogation from that of the FBI interrogation

6    which followed immediately in its footsteps.  To the Defendant, outside of the change in the

7    physical location of the interrogation (the U.S.S. San Antonio versus the FBI aircraft transporting

8    him to the United States), no difference existed between the two.  They were, for all practical

9    purposes (and especially considering Mr. al Liby being in an entirely alien setting, both

10   physically and psychologically) one and the same.  Having answered the CIA's questions for a

11   week, all he did was continue in that mode and answer further questions.

12         The final factor is the amount of time between the unlawful government conduct and the

13   interrogation that the government seeks to have justified.  As the Court put it,

14               Depending upon the circumstances, the passage of time may be persuasive on
15               the issue of attenuation in at least two ways.  All other things being equal, the
16               longer the time interval, the less likely that the defendant's rights were violated in
17               order to further the prosecution at issue and, in consequence, the less likely that
18               suppression of the challenged witness would deter future violations.

19   *Id.* at 283.

20         There is no bright-line rule that states that less than "X" hours is determinative on this issue.

21   See *United States v. $186,416.00 in United States Currency*, 590 F.3d 942, 951 (9th Cir. 2010).

22   What matters, in the end, is an analysis taking all facts and considerations into account, *i.e.*, the

23   totality of the circumstances. See *United States v. Conrad*, 673 F.3d 728, 733-34 (7th Cir. 2012);

24   *United States v. Shetler*, 665 F.3d 1150, 1159 (9th Cir. 2011).  As was set forth *supra*, the

25   "passage of time" here was all but non-existent.  Between the end of the CIA interrogation and

1  the commencement of the FBI interrogation was all of TWO HOURS.  In no manner can this

2  amount of time had any attenuating affect.  *See, e.g., Taylor v. Alabama,* 457 U.S. 687, 691

3  (1982) (six hours insufficient); *Brown v. Illinois, supra,* 422 U.S. at 604 (two hours insufficient

4  as to original statement and ten hours insufficient to follow-up statement).  *Cf., United States v.*

5  *Gross,* 662 F.3d 411-12 (6th Cir. 2011) (4 hours sufficient premised upon nature of intervening

6  occurrences).

7      Taking those "totality of the cirsumstances" into consideration can only lead to a finding that

8  the subject statement of the accused ought to be suppressed.

9  Dated : Sept. 16, 2014
10         White Plains, NY

11
12
13                                                     Bernard V. Kleinman
14                                                     Attorney for Defendant al Liby

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| | : |
| — *versus* — | :      98-cr-1023 (LAK) |
| | : |
| | :      Declaration in Support |
| ANAS AL LIBY, | :      of Motion |
| **Defendant.** | : |

STATE OF ~~NORTH CAROLINA~~ *New York* }
COUNTY OF ~~GRANVILLE~~ *New York* }        *s.s.:*

   1. I am Nazih abdul al Raghie, the Defendant in the above-captioned case, and I make this Declaration pursuant to Title 28 United States Code Section 1746, under penalty of perjury, in support of the relief sought in the annexed Notice of Motion to suppress Statements, and for such other relief as enumerated therein.

   2. The statements asserted as facts herein are based upon your Affirmant's personal experience and are asserted as a true report on the events leading up to my arrest, seizure, incarceration and torture by representatives of the United States Government  All matters about which Affirmant lacks personal knowledge are asserted herein as being upon information and belief.

   3. I am presently under indictment in S10 98-cr-1023 (LAK).

   4. I am falsely charged with participating in the 1998 East Africa Embassy Bombings allegedly perpetrated by persons associated with and acting on behalf of Al Qaeda.

1

5. With respect to my kidnapping and interrogation, in the early morning hours of October 5th, 2013 I was returning to my home from morning prayers. At this time I was living in Tripoli, Libya, with my wife and children, as a law abiding citizen.

6. I had been living in Tripoli since the overthrow of the dictator Col. Muammar Qaddafi, in which I joined with forces of NATO and the United States to replace his totalitarian state in 2010 and 2011.

7. From the late 1980s, when I was a student, until the overthrow of the Government of Col. Qaddafi I had been solely and exclusively politically and religiously devoted to the overthrow of the Qaddafi regime. This was the sole and exclusive reason for any involvement I may have had with any organizations. I had no political or religious reasons to engage in any activity directed against the West or any non-Islamic religious groups.

8. After I returned to Tripoli in 2011 I had no reason to fear that I would be arrested in connection with any alleged terrorist activity as I had fought, side by side, with the forces of NATO and the United States to rid the world of Col. Qaddafi. Furthermore, from 2011 until my kidnapping I had lived openly in Tripoli. During this period (and even beforehand) the CIA had maintained a long time presence in Tripoli, and, I believe, were well aware of where I lived and worked. Furthermore, no secret was ever maintained by me that my interests lie in the past and in the future in helping to establish a stable Islamic secular state in Libya.

9. When I was seized by, what I believe to have been members of the U.S. Army's Delta Force, I was tazered in both my legs and hands. An American, speaking in English, said to me that "we know you can understand us; just keep quiet." I was shoved into a mini-van or SUV, had ear muffs placed over my ears, my eyes were blindfolded, and I was placed in handcuffs.

2

10. During the initial ride, for the entire time, some person sat on me causing extreme difficulty in breathing.

11. I was taken to a building and held there until dark. While in the building I was kept on a hard floor, handcuffed and in leg irons. Neither the ear muffs nor the blindfold were ever removed from me. I was not offered any food, only water to drink.

12. The people who kidnapped me never identified themselves, never told me how long I would be held, or where I was going to be transported.

13. I was convinced that I would end up in one of CIA's black site torture prisons in Pakistan or the Bagram Air Base in Kabul, Afghanistan. I felt I would never see my family ever again. I lived in morbid fear of my imminent death where its only precursor would be torture.

14. Sometime in the evening I was brought, still blindfolded, with ear muffs, and hand cuffs, to a small boat, which I believe was a Zodiac-type vessel. The Zodiac transported me to another vessel. During the entire ride I felt sick and nauseas as the Zodiac seemed to bounce uncontrollably. I feared that I was going to be tossed overboard.

15. Once onboard this vessel, which I have now learned was the U.S.S. San Antonio, a U.S. Navy vessel, I was subjected to daily and constant interrogation by agents of the CIA. I know this because the interrogator identified himself as an agent of the CIA. He spoke English and there was an Egyptian interpreter with him. There was a third person present, a Lebanese, who also served as an interpreter. I believe that the name of the CIA interrogator was Abu Faris, but I am not sure. I also believe that one point or another a man was present during the interrogations who was identified as an FBI agent.

16. I was told, "This is the easiest step", and that the next step would be harder and then another step after that would be even harder. I took this to mean that the physical and

psychological torture would only increase if I failed to co-operate with my questioners.   These threats continued the entire time I was on board the ship.

17. I was never told what would happen to me after this interrogation was finished.   At no time was I ever told that I would be turned over to a civilian criminal court for prosecution in the Embassy Bombings case.   In fact, I was told that my interrogation would go on for 15 or 16 weeks.   As with my initial abduction, I was certain that, if lucky, I would end up at Guantanamo Bay, but more likely at a CIA torture prison.   I was thoroughly familiar with the CIA's torture sites and procedures as I was familiar, from the news, and from people who knew him, about the treatment of Hakim Bel Hadj who had been held and tortured in a CIA prison in Thailand and then turned over to Col. Qaddafi as part of the long time CIA/Qaddafi co-operation arrangements.

18. While I was interrogated for hours on end, I cannot say precisely how long each session was as I did not have a watch.   Furthermore, I was kept in complete isolation and had no idea when was day and when was night.   I was completely disoriented and confused.

19. When interrogated I was in a small room that had a video camera setup, no furniture at all, and was always interrogated forced to sit or lie on the floor.

20. The room where I was kept, while not being interrogated, also had no furniture whatsoever.   There was no bed, no chair, no sink, no toilet, no window — nothing at all to alleviate the pain and confusion I had.   There was a solid door so I could not see or hear any other people.   The light was kept on all of the time, every day, for 24 hours with no let up.   This made it all but impossible to sleep and rest.   Whenever I had to use the toilet I had to knock on the door and ask permission.   They gave me a blanket to sleep on, and a blanket as a pillow, and a blanket to cover me. That was all.   I was cold all of the time.   I was forced to take my meals in this

4

room. What the room did have was a camera so I was under video surveillance the entire time. I was convinced that I was going to end up in a CIA Torture Prison in Pakistan or Jordan.

21. I did not have any books, including a Quran. I did not know which direction was East, nor the times of day, so I could not pray as I should have.

22. Whenever I left the room I had ear muffs, handcuffs and a blindfold placed upon me.

23. My interrogators never informed me that I had the right to remain silent, the right to an attorney, or any human rights one would expect from America.

24. After how many days I did not know I was transported again and eventually placed on a plane. There were six persons on the plane, including FBI agents and an interpreter. Although I told the FBI agent that I had gone on a hunger strike and not eaten for at least three days, and had not slept for two days, I was handed a "waiver form" and told to sign it. After repeated verbal pressure to sign it, I did so.

25. After having been subject to the treatment above, and being confused and disoriented, with no understanding of where I was, or what would happen to me, I gave the statement the FBI has. I felt the only way to be treated fairly and humanely was if I did what I was told — after all, I had been subject to interrogation for more than a week and I felt there was little, if any, difference between the actions of the FBI and those of the CIA. After more than a week of intense interrogation by the CIA any sense of asserting my own rights, or having the ability to independently determine if I wished to voluntarily speak, was long since gone.

26. After America had acted so forthrightly in helping to overthrow Col. Qaddafi, I expected much more from this country. I now know better.

WHEREFORE, Declarant respectfully requests that this Court grant the relief sought in the annexed motion, together with all such further relief as this Court shall deem just and proper.

5

Nazih abdul al Raghie

Dated: ~~May ____, 2014~~ Sept. 11, 2014

~~FMC Butner~~

## CERTIFICATION

The translator hereby certifies the accuracy of this verbatim translation from the original document in Arabic.  He further affirms his competency as an Arabic translator / interpreter, approved by U.S. Federal Courts, New Jersey Administrative Office of the Courts, and several other authorities. His ATA (American Translators Association) membership # is 240123.

*/s/ Marwan Abdel-Rahman*
Marwan Abdel-Rahman

6

# Exhibit B

**Department of Defense News Release**

**IMMEDIATE RELEASE**

**Release No: 700-13**
**October 06, 2013**

**Statement by Pentagon Press Secretary George Little on the Capture of Abu Anas al Libi**

On Oct.5, the Department of Defense, acting under military authorities, conducted an operation to apprehend longtime Al Qaeda member Abu Anas al Libi in Libya. He is currently lawfully detained under the law of war in a secure location outside of Libya.

Wherever possible, our first priority is and always has been to apprehend terrorist suspects, and to preserve the opportunity to elicit valuable intelligence that can help us protect the American people.

Abu Anas al Libi has been indicted in the Southern District of New York in connection with his alleged role in Al Qaeda's conspiracy to kill U.S. nationals and to conduct attacks against U.S. interests worldwide, which included Al Qaeda plots to attack U.S. forces stationed in Saudi Arabia, Yemen, and Somalia, as well as the U.S. embassies in Dar es Salaam, Tanzania, and Nairobi, Kenya.

The successful capture operation was made possible by superb work and coordination across our national security agencies and the intelligence community, and was approved by President Obama. No American personnel or civilians on the ground were injured during the operation. These actions are a clear sign that the United States is committed to using all the tools at our disposal to bring to justice those who commit terrorist acts against Americans.

# Exhibit C

FD-302 (Rev. 5-8-10)                          -1 of 10-


OFFICIAL RECORD

UNCLASSIFIED//FOUO

FEDERAL BUREAU OF INVESTIGATION                    Date of entry   10/17/2013

NAZIH ABDUL HAMID AL-RUQAI, a.k.a. ANAS, a.k.a. ANAS AL-LIBY,
a.k.a. ANAS AL-SEBAI, Date of Birth 05/15/1964, Place of Birth Tripoli,
Libya, was contacted while on board a ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆ which was in transit to the United States (U.S.) from an
undisclosed country. Investigator ▆▆▆▆▆▆▆▆▆▆▆, Special Agent
▆▆▆▆▆▆▆▆▆▆▆, and Language Specialist ▆▆▆▆▆▆▆▆▆▆▆ identified
themselves, presented their credentials, and informed AL-RUQAI that they
are American investigators employed by the Federal Bureau of Investigation
(FBI) and the U.S. Department of Justice.  Investigator ▆▆▆▆ first
inquired about AL-RUQAI's health.  AL-RUQAI advised he is physically tired
and is on a hunger strike. He is upset by the manner in which he had been
captured, and because of this, AL-RUQAI decided to go on a hunger strike.
AL-RUQAI is aware he is wanted by the U.S. Government, and he inquired if
he will be going to a U.S. military or a civilian criminal court.
Investigator ▆▆▆▆ and Special Agent ▆▆▆▆▆ explained that AL-RUQAI's
case will be presented to a U.S. criminal court in New York. ▆▆▆▆▆▆▆▆
▆▆▆▆ advised AL-RUQAI that the interviewing investigators were aware he
had answered questions posed by different American personnel.  He explained
to AL-RUQAI that he and Special Agent ▆▆▆▆ were not interested in his
previous statements nor were they privy to its content.  AL-RUQAI was then
asked not to discuss the contents of his previous interviews.  ▆▆▆▆▆▆▆
▆▆▆▆▆ informed him that this was a new and different interview session.
AL-RUQAI was advised that he had certain rights under U.S. law.  At 9:21 AM
(Eastern Time), AL-RUQAI was offered the *Advice of Rights* form in the
Arabic language.  After reviewing the *Advice of Rights* with the assistance
of Language Specialist ▆▆▆▆▆, AL-RUQAI was asked if he understood the
terms and whether or not he had any questions.  AL-RUQAI advised that he
understood his rights and is willing to answer questions.  At 9:50 AM
(Eastern Time), AL-RUQAI consented to be interviewed.  He proceeded to
initial each paragraph of the *Advice of Rights* form and then signed the
bottom of the page.  Language Specialist ▆▆▆▆▆, Investigator ▆▆▆▆,
and Special Agent ▆▆▆▆▆ each signed the bottom of the page as witnesses.
After completing the *Advice of Rights*, AL-RUQAI provided the following
information entirely in the Arabic language:

UNCLASSIFIED//FOUO

Investigation on  10/12/2013  at  Not Applicable, Armed Forces Africa, Canada, Europe Or
Middle East, United States (In Person)

File #  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆          Date drafted  10/12/2013

by  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

INTERVIEW OF NAZIH ABDUL HAMID AL-RUQAI,
Continuation of FD-302 of a.k.a. ANAS AL-LIBY                    , On 10/12/2013 , Page 2 of 10

*ADMINISTRATIVE NOTE*

    Shortly after completing the *Advice of Rights*, AL-RUQAI informed
the interviewing investigators he was tired, and he requested time to rest.
The interviewing investigators told AL-RUQAI that they would ask the
medical personnel on the flight to check on him.  They also told him to
take an hour or so to rest.

    At 11:05 AM (Eastern Time), the interviewing investigators
contacted AL-RUQAI and asked if he felt ready and able to speak.  AL-RUQAI
was informed he could stop answering questions at any time, for any reason
whatsoever.  The interviewing investigators then asked AL-RUQAI to let them
know when he felt tired, sick, or otherwise unable to speak.  AL-RUQAI
advised he still felt tired but was able to speak and respond to questions.

NAMES

    AL-RUQAI's true name is NAZIH ABDUL HAMID AL-RUQAI, and the name of
AL-RUQAI's father is ABDUL HAMID.  The other names AL-RUQAI has used are
ANAS, ANAS AL-LIBY, and ANAS AL-SEBAI.  He advised that AL-RUQAI refers to
a district in Libya and that SEBAI is a smaller location within AL-RUQAI.

    With respect to *kunyas*, AL-RUQAI has used ones which refer to his
children.  AL-RUQAI has four (4) sons, and he has used the names ABU
ABDULLAH, ABU AHMED, ABU ABDUL MOHAIMEN, and ABU ABDUL RAHMAN.  AL-RUQAI
advised that his son ABDUL RAHMAN had passed away in Libya earlier this
year.  He stated that ABDUL RAHMAN had died as a martyr or *shahid*.

EDUCATION

    AL-RUQAI was born in Tripoli, Libya, and his date of birth is
05/15/1964.  He advised he has not used any other dates of birth.  AL-RUQAI
is a citizen of Libya, and he is not a citizen of any other country.  He
attended AL-FATEH UNIVERSITY in Tripoli and graduated in 1986 with a degree
in computer engineering                              .  AL-RUQAI advised he is skilled in computer
hardware and the construction thereof.

    While a student at the university, AL-RUQAI was detained and
questioned for three (3) days by the Libyan Internal Security Service.
AL-RUQAI advised that his cousin had been accused of burning the Green
Theater in Tripoli.  AL-RUQAI, along with two (2) cousins, was brought in
for questioning.

UNCLASSIFIED//FOUO

REDACTED

FD-302 (Rev. 5-8-10)                                    -1 of 2-

FEDERAL BUREAU OF INVESTIGATION



Date of entry    10/18/2013

         NAZIH ABDUL HAMID AL-RUQAI, a.k.a. ANAS, a.k.a. ANAS AL-LIBY,
a.k.a. ANAS AL-SEBAI, Date of Birth 05/15/1964, Place of Birth Tripoli,
Libya, was contacted at the ████████████████████████by
Investigator ████████, Special Agent ████████, and
Language Specialist ████████. AL-RUQAI was aware of the identities
of Inv. ████, SA ████, and LS ████ from the previous day's
interview. LS ████ provided translation between the English and
Arabic languages during this contact with AL-RUQAI.

         The contact with AL-RUQAI was made based on information which Inv.
████ and SA ████ received from LS ████. LS ████ informed
Inv. ████ and SA ████ that AL-RUGAI had told LS ████ of his
desire to have an attorney. AL-RUQAI expressed his desire to talk to an
attorney because he was having trouble focusing his thoughts due to his
abdominal pain. AL-RUQAI also told LS ████ that his reason for
seeking an attorney was due to his pain and inability to focus and not
because he didn't want to cooperate. LS ████ told AL-RUQAI that he
would inform Inv. ████ and SA ████ since AL-RUQAI did not make this
statement in their presence.

         On 10/13/2013, at approximately 7:15 PM, Inv. ████ informed
AL-RUQAI that he had learned from LS ████ of his decision to consult
with a lawyer. Inv. ████ instructed AL-RUQAI that his decision was
totally voluntary and that the interviewing investigators would respect
whatever decision AL-RUQAI made. Inv. ████ then told AL-RUQAI that if it
was his wish to speak with an attorney, then the interviewing investigators
would not ask him any more questions.

         At that point of the conversation, AL-RUQAI stated that he wished
to speak with an attorney. AL-RUQAI then apologized for not cooperating
any further and wished to thank the interviewing team for treating him with
dignity and respect. AL-RUQAI stated that he would have liked to have
continued talking to the interviewing investigators had he not had health
issues which have prevented him from focusing. AL-RUQAI advised he had
felt much more comfortable and focused yesterday than today.

         Inv. ████ then instructed LS ████ to inform AL-RUQAI that

                                    ████████████ New York, United States (In
Investigation on  10/13/2013  at Person)

File # ████████                                   Date drafted  10/15/2013

by ██████████████████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

                                              98 Cr. 1023 (LAK)-AAL-U-000021

FD-302a (Rev. 05-08-10)

████████████

Continuation of FD-302 of    Contact with NAZIH ABDUL HAMID AL-RUQAI,
                a.k.a. ANAS, ANAS AL-LIBY, & ANAS A-SEBBAI    , On   10/13/2013   , Page   2 of 2

his present medical care was not contingent on his cooperation with the
U.S. Government.  Inv. ████████ also instructed LS ████████ to inform
AL-RUQAI that his medical care would continue even though he no longer
wished to speak to the interviewing investigators without having an
attorney present.

      The interviewing investigators thanked AL-RUQAI for speaking with
them and informed him they would welcome the opportunity to speak with him
again, this time with his attorney present.  At approximately 7:26 PM,
AL-RUQAI was shown the same Arabic version of the Advice of Rights from the
previous day and was informed that the interviewing investigators would
record his request for an attorney on this form.  AL-RUQAI stated he
understood his rights and that he wished to speak with an attorney. At that
point all questioning immediately ceased.

98 Cr. 1023 (LAK)-AAL-U-000022

# Exhibit D

# REDACTED

# Exhibit E

# REDACTED

# Exhibit F

<u>إشعار بالحقوق</u>

نحن ضباط ملفذين للقانون الأمريكي.  القانون الأمريكي يوفر لك حقوق معينة في تعاملك معنا.N/R
قبل أن نسألك أية أسئلة، نريد أن نتأكد من أنك تفهم حقوقك.N.R
لك الحق أن تبقى صامتا. N.R.
إذا سبق لك أن أدليت بتصريحات، فمن الجائز أن لا نستخدم هذه التصريحات ضدك في المحكمة الأمريكية. N.R
أي شيء تقوله الآن يمكن إستخدامه ضدك في المحكمة. N.R
لك الحق في إستشارة محام قبل أن نسألك أية أسئلة N.R.R
لك الحق في وجود محاميك معك خلال الإستجواب. N.R.R
إن لم تكن لديك القدرة المالية على تعيين محام، سوف يُعين لك واحداً قبل أي استجواب إذا رغبت. R.R.
نحن لا يهمنا أي تصريحات تكون قد أدليت بها لأحد من قبل.  نحن لا نهتم بما قلته لأحد في الماضي.  نحن نبدأ من جديد.  أنت
لا تحتاج أن تتحدث معنا اليوم تحديداً لأنك قد تحدثت مع آخرين في الماضي. N.R

<u>إشعار بإستلام الحقوق والتنازل عن الحقين في وجود محامي والبقاء صامتاً</u>

أنا مستعد لإدلاء تصريح والإجابة على أسئلة. N.R
أنا لا أريد محامياً في الوقت الحالي. R.R
أنا فاهم لحقوقي وأراني هو بطلي و أطوعين. R.R
لم تعطى لي أية وعود أو تهديدات ولا ضغط أو إكراه من أي نوع إستخدم ضدي R.R

الإسم: نبيه عبد الحميد الرفعي

التوقيع: ـــــــــــــ

إسم الشاهد: ▮▮▮▮▮▮

توقيع الشاهد: ▮▮▮▮▮▮

التاريخ/الوقت: 9:50AM  10/12/2003

Investigator

▮▮▮▮▮▮

Special Agent

▮▮▮▮▮▮

98 Cr. 1023 (LAK)-AAL-U-000020

# Exhibit G

REDACTED

# Exhibit H

# REDACTED