USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/23/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

-against-  S7 98-cr-1023 (LAK)

KHALID AL FAWWAZ,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

-against-  S10 98-cr-1023 (LAK)

ANAS AL LIBY a/k/a Nasih al Rahjie, a/k/a Anas al Sebai,

                Defendant.[1]
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM AND ORDER
(Corrected)

LEWIS A. KAPLAN, *District Judge.*

      Defendant al Fawwaz here stands indicted for conspiring to kill Americans, among other offenses. Jury selection began in December when a large number of prospective jurors completed an extensive questionnaire which both sides have reviewed. On the basis of those questionnaire responses, various prospective jurors already have been excused.

      Trial now is scheduled – after several postponements, some at al Fawwaz's request – to proceed on January 20, 2015 with the commencement of oral *voir dire*. Nevertheless, on

---

[1] The Court has been informed that this defendant is deceased and that the government intends to submit a *nolle prosequi*. He is included in the caption pending submission and approval of the *nolle*.

January 12, 2015, after the first part of jury selection had been completed, al Fawwaz moved for a change of venue to another district and for other relief.

The motion notes that Al Qaeda in the Arabian Peninsula ("AQAP") on or about January 8, 2015, according to some web sites, urged "Muslim brothers" to take "revenge" for the death in custody of Anas al Liby, who was to have been tried jointly with al Fawwaz. This, al Fawwaz says, (1) makes each juror in this case "a potential victim and . . . personally invested in the outcome," and (2) links AQAP to al Liby and the Embassy bombings.[2] Moreover, he claims that there has been "massive publicity surrounding [what he characterizes as] the controversy of Mr. Al Liby's death [which] has resurrected the embassy bombings in the minds of the public."[3] He therefore urges "[r]emoval of this case to a federal district court less inextricably tied to the 9/11 tragedy . . . [to] ameliorate the damage to Mr. Al Fawwaz's defense and reduce the potential for any danger to the Court, its staff, the jurors, or the parties."[4] The premise seems to be that a jury in another district would be less likely to know that al Fawwaz and al Liby "were once charged together."[5]

---

[2] Al Fawwaz Mot. for Change of Venue and Other Relief (Jan. 12, 2015) (filed under seal) [DI 1844], at 1-2.

[3] *Id.* at 2.

[4] *Id.*

[5] *Id.* at 3.

In fact, al Fawwaz and al Liby never were "charged together," as al Fawwaz claims. They are defendants on different superseding indictments and were charged many years apart. They were, however, to have been tried jointly because the charges against them overlap. *See* Order (Dec. 12, 2013) [DI 1400].

3

In the event the Court does not transfer the case to another district, al Fawwaz asks that it dismiss the current venire, call a new panel, and delay the case for 60 days "to allow for the publicity of the AQAP threat to dissipate."[6]

The motion is entirely without merit and is denied, just as Judge O'Toole today denied a comparable motion in the so-called Boston Marathon case.[7]

*Facts*

The crimes with which al Fawwaz is charged allegedly took place in the 1990s. The Embassy bombings, which allegedly were acts in furtherance of one or more of the conspiracies alleged here, occurred on August 7, 1998. The case against al Fawwaz is only now going to trial for two reasons. First, al Fawwaz, as was his right, fiercely litigated, in the United Kingdom and before the European Court of Human Rights, for many years in an ultimately unsuccessful attempt to block his extradition to the United States. Second, this Court granted al Fawwaz other adjournments after he was extradited to this country on October 6, 2012, most recently two totaling more than two months.

*The Current Status of this Case*

Jurors were summoned on December 17 and 18 to complete questionnaires to facilitate jury selection for this trial. By the conclusion of those proceedings, 707 prospective jurors

---

[6] *Id.* at 3, 10.

[7] *United States v. Tsarnaev*, Crim. No. 13-10200-GAO (D. Mass. Jan. 14, 2015) (electronic order).

had completed the questionnaires.[8] The parties by agreement have excused 102 of them on the basis of their responses, leaving 605 prospective jurors in the panel. One side or the other has suggested follow up examination of many of the 605 on the basis of their respective responses to the questionnaire. It seems reasonable to assume that some of those prospective jurors will be excused and some will be acceptable. It is important to note also that neither side has requested any follow up examination based on questionnaire responses of 55 of the 605 members of the panel, a number that would be more than sufficient to seat a jury of twelve and six alternates even if the parties exercised all of their peremptory challenges and even if all of the prospective jurors slated for follow up questioning were excused.

It is, moreover, important to note that the Court sought to prevent the panel from being exposed to prejudicial publicity between completing the questionnaires in December and the commencement of oral *voir dire* in January. It specifically instructed all prospective jurors to avoid news reports:

> "Now, there is a possibility, which some of you may have figured out already, that there is going to be press coverage of this trial, perhaps as early as today or tomorrow. I instruct you that from this moment on, *you are not to read or watch or listen to anything that has anything at all to do with this case*. You are not to discuss it among yourselves, you are not to discuss it with anyone else, including your family, friends, anyone. *You're not to do any research about the case or anybody involved in it*. That includes the defendant[s], it includes the judge, it includes the lawyers who[m] you've not met yet. And it means, among other things, that you're not to chatter about it on Facebook, or on any of those services. You're not to read anything about it online. You are not to Google search. You're not to do any of that stuff.
>
> "You know, when I started as a judge here, none of it existed. I guess I'm happy to say I've lived long enough so that's true. But *you're not to use any of these*

---

[8] Although 709 prospective jurors appeared on December 17 and 18, only 707 prospective jurors completed questionnaires.

*modern conveniences to try to figure out any more about this case than I've told you already.*"[9]

If the prospective jurors adhered to that instruction, none of them even will have been exposed to any news reports concerning al Liby's death or any related matters. We presume that jurors follow such instructions.[10] Moreover, there will be ample opportunity to pursue the issue during the oral *voir dire*. Thus, even if there had been a great deal of very prejudicial media coverage over the past several weeks, there would be no reason to change the venue or postpone the trial even before conducting the oral *voir dire* with the current panel. The Court will conduct an appropriate oral *voir dire*, informed by events since December 18.

*The Publicity*

In arguing for a change of venue or other relief, al Fawwaz relies upon the supposed AQAP threat of revenge for al Liby's death and upon what he evidently anticipates will be a controversy relating to that death. But the facts concerning the death and the coverage both of the death and the reaction to it have not risen to a level sufficient to warrant a change of venue, a postponement, or drawing a new jury panel without even determining whether an impartial jury may be seated from the existing panel.

Anas al Liby was apprehended by U.S. forces in Tripoli in late 2013. He was presented and arraigned in this Court on October 15, 2013. The Court and counsel promptly learned

---

[9] Tr., Dec. 17, 2014, at 4:8-5:1 (emphasis added); *accord,* Tr., Dec. 18, 2014, at 4:12-5:10.

[10] *E.g., Richardson v. Marsh*, 481 U.S. 200, 206 (1987) ("[T]he almost invariable assumption of the law [is] that jurors follow their instructions.").

that al Liby suffered from severe liver disease and, by June 18, 2014, that he probably had terminal liver cancer.[11]  In the event, al Liby passed away on January 2, 2015.[12]

There was a certain amount of news coverage of al Liby's death, much of it available in this country only on the Internet, a medium that the prospective jurors specifically had been told to avoid.  Al Fawwaz's counsel cites only four stories on the subject – one on the CNN web site; one on the web site of *The Independent*, a British paper; one a yahoo.com report of an Agence France-Presse story; and one in *The New York Times* print and web outlets.[13]  The Court, as a citizen well attuned to reports about this and similar cases, is aware that there have been some other reports.  But the defense has not cited, and the Court is not aware of any reporting that would be so likely to prejudice anyone who heard or saw it as to warrant the conclusion – without even conducting a *voir dire* to find out which prospective jurors had been exposed to the reports and the effect, if any, of any such exposure – that a fair and impartial jury could not be empaneled.

So far as counsel refer to an alleged "controversy" concerning al Liby's death, the reference appears to be to the fact that someone described in an Agence France-Press story as "[a] member of an Islamist-led government in Libya, which is not recognized by the international community," reportedly commented that there "is speculation about how [al Liby] died in prison."[14]  The Court is aware also of a CNN report that purported to quote al Liby's son, Abdel Mouin, as

---

[11] Al Liby Mot. for Severance (June 18, 2014) (filed under seal) [DI 1637].

[12] See Ltr. from S. Buckley to Court (Jan. 3, 2015) [DI 1821].

[13] DI 1844, at 3-4 & nn.4-7.

[14] *Id.* at 5 & n.10.

saying that "[t]he family holds the U.S. government 'fully responsible' for what happened."[15] Al Fawwaz refers also to another Agence France-Press report that AQAP had urged Muslims "to avenge" al Liby's death and threatened that Americans would "pay the price for crimes from the blood of soldiers and people."[16]

The likelihood that these relatively few references were even seen by any of the prospective jurors – particularly in light of the Court's instructions – or, if seen, that they would result in prejudice against al Fawwaz seems remote.

The final point to be made about publicity relates to the unfortunate events in France on January 7, 2015 and thereafter – the killings by reported AQAP sympathizers and/or associates of a number of victims at the *Charlie Hebdo* magazine and a butcher stop and the deaths of the killers when the French authorities located and closed in on them. Publicity concerning those occurrences was widespread, and some prospective jurors probably were exposed to some of it.

*Discussion*

Al Fawwaz seeks a change of venue or, at least, the dismissal of the existing panel of prospective jurors in advance of oral *voir dire* and in entire disregard of the extensive information about that panel already available from the 707 questionnaires in which they responded to searching questions designed to elicit information concerning possible bias or predisposition. This, then is a

---

[15] Jomana Karadsheh, *Alleged Al Qaeda Operative Abu Anas Al Libi Dies in U.S. Hospital, Family Says,* CNN (Jan. 3, 2015), *available at* http://www.cnn.com/2015/01/03/us/us-libya-al-libi/ (last visited Jan. 14, 2015).

[16] *Id.* at 4 & n.7.

very radical application. Moreover, while the Court commends counsel's dedication, the motion lacks merit.

A.  *Change of Venue and Related Relief*

The law that controls this application is relatively clear. It was comprehensively summarized by one of my colleagues just a month ago:[17]

> A.  The Constitutional Standard
>
> "The Sixth Amendment secures to criminal defendants the right to a trial by an impartial jury." *Skilling v. United States*, 561 U.S. 358, 377 (2010); *see* U.S. Const. amend. VI. Although the Constitution provides that criminal trials shall be held in the state and district where the crimes were committed, *see* U.S. Const. art. III, § 2, cl. 3 & amend. VI, "[t]he Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'" *Skilling*, 561 U.S. at 378 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).
>
> Where a defendant raises a constitutional challenge to the venue of his trial before jury selection, he "must make a showing of presumed prejudice, arising when 'prejudicial publicity so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community.'" *United States v. Volpe*, 42 F. Supp. 2d 204, 216 (E.D.N.Y.1999) (quoting *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir.1980)). For instance, in *Rideau v. Louisiana*, the defendant's taped confession to murder, kidnapping, and armed robbery was broadcast three times to audiences of 24,000 to 53,000 people. 373 U.S. 723, 724–25 (1963). The entire parish in which the defendant was tried contained approximately 150,000 people. *Id.* at 724. In these circumstances, the Supreme Court held that the defendant's motion for change of venue should have been granted even before jury selection because "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle [of a publicized confession] could be but a hollow formality." *Id.* at 726.

---

[17] *United States v. Ayala*, Nos. 12–CR–63 (JFB), 12–CR–317 (JFB), 2014 WL 6971414, at *2-3 (E.D.N.Y. Dec. 10, 2104) (alteration in original) (footnote omitted).

"A presumption of prejudice, [the Supreme Court's] decisions indicate, attends only the extreme case," such as *Rideau*, where the "trial atmosphere . . . was utterly corrupted by press coverage." *Skilling*, 561 U.S. at 380–81 (internal quotation marks, citations, and brackets omitted); *see also United States v. Sabhnani*, 599 F.3d 215, 233 (2d Cir.2010) (noting that cases where adverse pretrial publicity warrants a presumption of prejudice "are very rare, however, and have been characterized . . . as 'extreme situation[s]'" (quoting *United States v. Campa*, 459 F.3d 1121, 1143 (11th Cir. 2006) (en banc))). In most cases, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). "Qualified jurors need not . . . be totally ignorant of the facts and issues involved." *Murphy v. Florida*, 421 U.S. 794, 799–800 (1975); *see also Skilling*, 561 U.S. at 360 (holding that "juror impartiality does not require ignorance" (emphasis in original)). Indeed, among Supreme Court decisions, *Rideau* stands alone as the only one in which the Supreme Court has "found presumptive prejudice deriving solely from pretrial publicity." *Volpe*, 42 F. Supp. 2d at 216.

B. Federal Rule of Criminal Procedure 21(a)

"Upon the defendant's motion," Federal Rule of Criminal Procedure 21(a) also requires the transfer of "the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed.R.Crim.P. 21(a). "Substantial publicity alone is not enough to require a change of venue." *United States v. Stevens*, 83 F.3d 60, 66 (2d Cir.1996). Instead, "[i]n order to prevail on a motion under Rule 21(a), the defendant must show 'a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial.'" *United States v. Maldonado–Rivera*, 922 F.2d 934, 966–67 (2d Cir.1990) (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966)); *see also Sabhnani*, 599 F.3d at 232. Factors for a court to consider in making this decision include "the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendants charged with it, and other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially." *Maldonado–Rivera*, 922 F.2d at 967. "A defendant making a pre-voir dire motion to change venue is faced with a difficult burden of showing that the nature of adverse pretrial publicity is such that makes a fair trial unlikely, and thus, inherent prejudice must be presumed." *United States v. Salim*, 151 F. Supp. 2d 281, 282 (S.D.N.Y. 2001). Finally, "[t]he ultimate determination of whether unfavorable publicity renders a fair trial unlikely is committed to the district court's discretion. . . ." *Maldonado–Rivera*, 922 F.2d at 967; *see also Skilling*, 561 U.S. at 378 n.11 (noting that, under Rule 21(a), "district-court calls on the necessity of transfer are granted a healthy measure of appellate-court respect").

10

There is no substantial case for a change of venue in this case, least of all before the completion of *voir dire*.

First, there is nothing here that is remotely comparable to what occurred in *Rideau* – the repeated broadcast to a small community of the defendant's obviously prejudicial confession. The trial atmosphere in this case certainly has not been "utterly corrupted by press coverage."[18]

Second, the pretrial publicity in this case has not even remotely approached pervasiveness. Al Fawwaz has not shown that either its substance or its volume warrants a conclusion – especially before *voir dire* is completed – that there is "a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial."[19] Nor has he shown that any fairer trial could be held anywhere else in this country.

Third, the existing panel of prospective jurors was instructed almost a month ago – in clear, certain terms – to avoid any pretrial publicity relating to this case. The events relied upon by al Fawwaz in support of this motion – al Liby's death on January 2 and the events in France on January 7 and the ensuing day or two – all came after those instructions. And even if some prospective jurors paid attention to stories about the French events, which they quite innocently may have done because they were not obviously related to this case, the question of their impact, if any, can be dealt with adequately in *voir dire*.

Fourth, al Fawwaz's studied disregard of the 707 completed juror questionnaires already in hand is striking. The parties already have excused a significant number of prospective jurors on consent, but the pool from which to draw a jury nevertheless contains 605 prospective

---

[18] See *Skilling*, 561 U.S. at 380.

[19] *Maldonado–Rivera*, 922 F.2d at 966–67.

jurors. Despite probing inquiry on the questionnaire into the existence of possible bias and, in addition, to circumstances that might lead to possible predisposition, 55 of the remaining pool of 605 prospective jurors gave no answer whatever that either side suggested warranted any follow up questioning with respect to prejudice. The likelihood is strong that *voir dire* will yield a group of prospective jurors not subject to any legitimate concern for bias. The pool is sufficiently large to think it entirely adequate to select twelve impartial jurors and six impartial alternates.[20]

Finally, there would be no basis for moving the trial out of the Southern District of New York even if it were to prove necessary to discharge the existing panel and summon a new one. This Court draws jurors for trials in the Moynihan courthouse from five counties: New York, Bronx, Westchester, Putnam and Rockland.[21] Their estimated aggregate population as of July 1, 2010, was in excess of 4.3 million people.[22] Juries frequently have been empaneled in this district after September 11, 2001 in trials involving alleged terrorism and related offenses without incident.[23]

---

[20] Assuming that the parties exercise all available peremptory challenges (22 – 16 with respect to jurors and six with respect to alternates), only 40 qualified persons would be required. Thus, a jury and six alternates can be selected out of this venire unless more than 565 of the 605 prospective jurors are excused.

[21] Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York, Art. IV.B, *available at* http://www.nysd.uscourts.gov/jury_handbook/juryplan_feb_2009.pdf (last visited Jan. 12, 2015).

[22] New York State Dep't of Labor, *Statewide and County Population Data* (2000-2010), *available at* http://labor.ny.gov/stats/nys/statewide-population-data.shtm (last visited Jan. 12, 2015).

[23] *See, e.g., United States v. Mostafa*, 04 Cr. 356 (KBF); *United States v. Ghayth*, 98 Cr. 1023 (LAK); *United States v. Ghailani*, 98 Cr. 1023 (LAK), *aff'd*, 733 F.3d 29 (2d Cir. 2013); *United States v. Stewart*, 02 Cr. 395 (JGK), *aff'd*, 590 F.3d 93 (2d Cir. 2009).

B. *The Request for a Continuance on this Ground*

  Al Fawwaz asks in the alternative that the trial be postponed for sixty days in light of al Liby's death and the reported AQAP threat. That request, to the extent based on these grounds, likewise lacks merit.

  Al Liby, to begin there, died on January 2, 2015. Oral *voir dire* will not commence until January 20. Opening statements will not take place before January 22 at the earliest. In substance, then, three weeks will have passed between al Liby's death and the start of the testimony. In view of the Court's instructions to the panel in December, the nature and relatively limited extent of the publicity concerning al Liby's death, and that three-week interval, the Court sees no reason on that account to put off the trial any further. The same conclusion is even stronger with respect to the so-called AQAP threat, which seems to have received considerably less attention in the media than the death of al Liby.

  Moreover, it is quite important to remember that postponements in circumstances such as this are not necessarily unmixed blessings from the standpoint of a defendant who is hoping for the dissipation of what he regards, or says he regards, as negative publicity. Events happen during postponements. Sometimes they can make matters worse. This is a case in point. As recently as October 2014, this case was scheduled to go to trial on November 3, 2014,[24] a date postponed at al Fawwaz's request. Everything of which al Fawwaz complains in the present motion for yet another postponement – al Liby's death, the so-called AQAP threat, and the recent events in France – occurred during that interval.

---

[24] There had been earlier trial settings as well.

*Conclusion*

For the foregoing reasons, al Fawwaz's motion for a change of venue, to strike the current jury venire, and to continue the trial date [DI 1844] is denied in all respects. This is without prejudice to al Fawwaz's other pending motion for a postponement on other grounds, which will be decided in due course.

SO ORDERED.

Dated:      January 14, 2015
Corrected:  January 20, 2015

_____
Lewis A. Kaplan
United States District Judge